UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2014 MAY -9  P 4: 12

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA    )
                              )
            v.                    )    Cr. No. 06-10305-MLW
                              )
ESTHER ARIAS,              )
    Defendant         )

**AFFIDAVIT OF JOSE A. ESPINOSA**

Now comes Jose A. Espinosa, and being duly sworn depose and states as follows:

1. My name is Jose A. Espinosa. I currently live in Jamaica Plain, Massachusetts;

2. I am in receipt of an Order from the Court dated April 4, 2014 which requires me
to file and serve an affidavit addressing Ms. Arias' contentions and detailing any
pertinent conversations, correspondence, and documentation regarding Ms. Arias'
amended motion under 28 U.S.C. §2255 to vacate, set aside, or correct the
sentence imposed on her.

3. I am aware that Ms. Arias has filed in the past similar motions, however, in
preparing this affidavit I have limited myself to addressing the issues raised by
Ms. Arias in her Petition, filed on February 11, 2014, and which appears as
Document 383 in the Criminal Docket for all defendants in case #: 1:06-cr-10305-
MLW;

4. In the event that the Court wishes me to address any other contention in any prior
motion filed by Ms. Arias I am more than ready, willing and able to comply with
any such request and/or Order from the Court;

5. In reviewing Ms. Arias' Petition Pursuant to 28 U.S.C. §2255 she alleges that I
was disbarred from practicing law from 1990 to 1997. I was not disbarred, did not
have any disciplinary hearings or any formal findings or recommendations of

disbarment during the period Ms. Arias alleges. I did resign from the

Massachusetts Bar effective December 1990;

6. By the terms of my resignation I was entitled to apply for reinstatement after a

three year period had passed. I waited nearly seven (7) years to reapply and was

reinstated in 1997;

7. I was disbarred effective November 13, 2012. My disbarment is not for life and

like anyone else disbarred from the Massachusetts Bar, I am entitled to seek

readmission after eight (8) years;

8. In reviewing Ms. Arias' allegations of Ineffective Counsel Due to Failure to

Investigate there are numerous allegations and facts that I disagree with as

detailed in the following paragraphs;

9. My first knowledge of, or contact with, Ms. Arias was when she reached out to me

in mid-July, 2007 by having her then boyfriend, Lorenzo Martinez, call me at my

office and through him, requested that I visit her at the Bristol County House of

Corrections in Dartmouth, Massachusetts where she was being held by the United

States Marshal's Service pending her trial;

10. When I first met Ms. Arias, she told me that she had been given my name and

telephone number by a former client of mine named Leslihe Abad. I had

represented Ms. Abad in connection with a criminal case in the United States

District Court for the District of Massachusetts in Docket No. 1:05-cr-10304-

GAO;

11. Ms. Abad had apparently spent some time as a fellow inmate at the Bristol County

House of Corrections with Ms. Arias;

12. When I visited Ms. Arias for the first time in mid-July, 2007 she informed me that

she was being represented by Attorney John Moss who had been appointed by the

2

Court and that she had lost confidence in him; that she had two separate indictments pending that were scheduled for trial in about two months; that she wanted a lawyer that spoke Spanish fluently because she felt that the cultural affinity would enable her to better understand the legal problems she was facing; that she had filed a motion with the Court seeking Attorney Moss' removal from her case;

13. Ms. Arias also told me during the first meeting that her boyfriend would be paying for the legal fees and that if she and I made an agreement she would arrange for him to call me and pay my initial fee to represent her;

14. Prior to our first meeting I had gotten the docket numbers for the cases she had pending and I looked into PACER to get an idea of the stages of her cases. I also advised Ms. Arias that she was seeking to change lawyers a bit late in the game and that the two Judges involved in her cases would not necessarily allow for a change;

15. I reviewed the docket sheets of the cases and returned a couple of days later to the Bristol County House of Corrections and spoke at length about her cases. I had seen the indictments and pleadings to date and told her that from all that I saw her cases were ready for trial;

16. Motions had been filed and acted on by the Court; all discovery had been complied with and it seemed as though there was nothing left to be done by way of motions and/or additional discovery;

17. Ms. Arias indicated without any equivocation her desire to have me represent her. She told me that whether I accepted her case or not, she was in the process already of requesting that the Court remove Attorney Moss from her case;

18. Ms. Arias and I then discussed my fees, to which she agreed and I indicated what I needed to start the case. I also warned her that my filing a Notice of Appearance would not guarantee that the Court would permit me to represent her. In fact the initial fee requested by me only took into account the cost of my seeking to enter the case as I was not sure that I would be permitted to represent her;

19. A day or two after our meeting Ms. Arias' boyfriend came to my office to pay my initial fees and on or about July 23, 2007 I filed a Notice of Attorney Appearance on her two cases;

20. When I met Ms. Arias' boyfriend it was the first time that I had met him. I had not had any prior dealings with him in any capacity;

21. I don't understand Ms. Arias' allegations of conflict of interests. It was Ms. Arias' suggestion that her boyfriend would pay my fee on her behalf. Her boyfriend was never involved in her case other than knowing the dates that the Court had scheduled. I submit that his payment of legal fees did not create or cause any conflict of interest;

22. I had made it clear to Ms. Arias that although her boyfriend would be paying for her legal services I would not be discussing her case with him in any form other than general terms; no specifics of her case were ever discussed by me with the boyfriend;

23. From my subsequent representation of Ms. Arias I learned from her that she regularly spoke with her boyfriend about specific aspects of the cases;

24. I never sat down with her boyfriend to be given directions by him regarding her defense;

25. I never gave her boyfriend any discovery regarding Ms. Arias' case;

26. Ms. Arias did tell me that her boyfriend had custody of her United States Passport and that he would surrender that passport for review when she authorized him to do so;

27. I did not see the actual passport and any stamps from any Customs Agency from the Dominican Republic or the United States Immigration and Customs Enforcement until Ms. Arias' boyfriend brought same to the Court while she was testifying;

28. Prior to filing my Notice of Appearance I had called Attorney Moss and informed him of my involvement in Ms. Arias' cases. My recollection is that Attorney Moss indicated that he would be more than happy to give me the case file if I were permitted to enter my appearances in the two cases;

29. At around the same time I also contacted Victor A. Wild, the Assistant United States Attorney on the case, who advised me that he was preparing for trial but would wait for the decision from each judge as to my representation;

30. On July 25, 2007 I filed a Motion to continue Ms. Arias' trial to October 24, 2007 and when Attorney Moss filed a Motion to Withdraw, the Court scheduled a Hearing on the Motions for August 2, 2007;

31. On August 2, 2007 a hearing was held before Judge Wolf and Attorney Moss was permitted to withdraw as counsel; I was permitted to represent Ms. Arias and the case was continued for trial to November 13, 2007;

32. At the hearing representations were made by me in open court and on the record with Ms. Arias present with an interpreter that my review of the case to that point indicated that the case was ready for trial; that no further motions for discovery would be filed; and that no further motions to suppress would be filed;

33. Ms. Arias, who is fluent in Spanish and in English, at the time of the Court hearing did voice any objections in open court, or in written form to my representations;

34. Between my second meeting with Ms. Arias and subsequently until she refused to speak with me after dismissing me amid the trial before this Court, I would visit Ms. Arias no less than three times per week to prepare for her case;

35. At the time that I was representing Ms. Arias in 2007 I was living in North Easton, Massachusetts which is in Bristol County. The Bristol House of Corrections was less than a half-hour from my house and it was very convenient for me to visit her and review her cases;

36. A few days after Attorney Moss was permitted to withdraw from the case, I arranged for the case files to be delivered to my office. I received two very large boxes from Attorney Moss. Each box contained all the discovery, motions and notes that Attorney Moss had assembled during the representation of Ms. Arias;

37. Attorney Moss' work-product was excellently organized and it was organized in a very good chronological order. It was very easy for me to pick up the files, read them and pick up the threads where he had left off to enable me to fully understand the charges, the strength of the government's case and what Ms. Arias was up against;

38. To assist me in the cases I had Kristina Hedin (now Kristina Hedin Dermibilek) full-time associate who had been working with me since she was a second-year student at New England Law School and who had been admitted as an Attorney in Massachusetts in November, 2005, assist me with the preparation, research and analysis of the case;

39. Ms. Hedin assisted me exclusively in all criminal matters at the state and federal level and always did an excellent job for me. She is a thorough and knowledgeable researcher who had majored as an undergraduate in computer sciences and understands electronic legal research better than most attorneys that I have encountered;

40. I had introduced Ms. Hedin to Ms. Arias during one of our first court hearings at the Marshal's lockup;

41. Ms. Hedin had also gone to the jail with me at least two times to discuss her case. Ms. Hedin and Ms. Arias had a good working relationship;

42. In particular Ms. Hedin and I met with Ms. Arias prior to the jury selection of her first case before Judge Woodlock;

43. I had informed Ms. Arias that I had a jury deliberating in Suffolk Superior Court on a rape case and that I would be unable to be present during her jury selection before Judge Woodlock but that Ms. Hedin would be selecting the jury with her assistance;

44. Ms. Arias did not express any objection to Ms. Hedin assisting in the jury selection while I was not present;

45. Ms. Arias, Ms. Hedin and I discussed extensively the type of juror that we wanted for her case;

46. I understand from Ms. Hedin that Ms. Arias was very active in the selection of the jury;

47. I also understand that prior to the jury selection Judge Woodlock inquired from Ms. Arias whether she had any objection to Ms. Hedin being there and my absence and that Ms. Arias did not express any objection;

48. I know that Ms. Arias had the services of a court-certified Spanish-speaking interpreter at all times during her proceedings to ensure that she fully understood her rights and the court proceedings;

49. At some point during the first trial, Ms. Arias wrote Judge Woodlock a letter complaining that the jury selection had been done by Ms. Hedin and alleging that Ms. Hedin was not a licensed Attorney in the Commonwealth Massachusetts;

50. Judge Woodlock conducted a hearing regarding Ms. Arias' allegations in which he informed Ms. Arias that he had confirmed, contrary to Ms. Arias' assertion, that Ms. Hedin was a licensed Attorney in the Commonwealth of Massachusetts; stated that he had observed the jury selection and that he saw nothing objectionable to her professionalism and performance; he also noted that he had observed interaction between Ms. Hedin and Ms. Arias which indicated active participation on Ms. Arias' part in the selection of her jury;

51. Prior to Ms. Arias' trials, Ms. Hedin had become an indispensable, hard working associate who had worked with me on several complex criminal matters at both the state and federal level;

52. Because I did not want any stone unturned in Ms. Arias' case, Ms. Hedin worked very hard on the Arias cases;

53. In my review of the case files from Attorney Moss, there was nothing regarding possible domestic abuse of Ms. Arias;

54. The allegations of domestic violence as a defense are new issues never raised to me by Ms. Arias as a substantive defense;

55. During my representation of her, Ms. Arias, never gave me any information regarding domestic abuse until very late in the trial before Judge Wolf;

56. Moreover, she never provided me with any evidence that she was a victim of domestic abuse;

57. Ms. Arias did not provide me with any names of any witnesses for me to interview on her behalf to substantiate domestic abuse;

58. In reading her §2255 application it appears that Ms. Arias is saying that her defense of abuse required an admission that she in fact had more than one apartment with the consent and approval from HUD which was, as I read her application, aware that she was a victim of domestic abuse;

59. I reviewed all of Ms. Arias' discovery from HUD and other investigative agencies involved in the investigation of her case and I never saw any documents making reference to the consent and approval of more than one apartment because of domestic abuse or any other reason;

60. From the time that I fully analyzed Ms. Arias' predicaments and realized that the government cases against her were overwhelming and that going to trial would have disastrous consequences for her, I advised her of these conclusions in advance of her first trial;

61. Ms. Arias alleges that she had given me her passport as evidence of her claims of not being in the United States at the time of the instant offense, this is not true;

62. I had seen a copy of a Passport issued by the Dominican Republic government in the documents that I received from Attorney Moss. I never received the actual passport from the Dominican Republic nor did I have in my possession her United States Passport[1];

63. I do not recall at any time seeing a copy of Ms. Arias' United States passport until approximately a week prior to her trial before Judge Wolf. I never saw Ms. Arias'

---

[1] Ms. Arias had informed me that she had a valid United States passport because she had obtained derivative United States citizenship when her mother became a Naturalized United States citizen and Ms. Arias had been young enough to qualify for United States citizenship.

original United States passport until mid-trial before Judge Wolf when she was testifying, against my advice, and her boyfriend stood up during her testimony and waved the original passport which was in his possession;

64. In my preparation for Ms. Arias cases, she had admitted to me that she had gotten a relative of hers who worked for the Dominican Republic Government to put stamps in her United States Passport showing that she had entered and left the Dominican Republic at times that would coincide with an alibi;

65. In none of the documents that I received from Attorney Moss was there the remotest credible evidence that her United States passport represented a valid alibi;

66. I have reviewed the testimony of Attorney Moss before Judge Wolf in this case. I concur with his assessment that Ms. Arias' United States passport should not be used as evidence in her trial. In fact Attorney Moss and I discussed the stamps in Ms. Arias' United States passport and it was his opinion, which I agreed with, that the stamps showing entry to and departure from the Dominican Republic were not legitimate;

67. I advised Ms. Arias that I refused to participate in presenting a defense I knew to be false;

68. Prior to trial I had reviewed a photograph of Ms. Arias from the Government's evidence that I informed her was a very compromising and damning piece of evidence against her;

69. I had used that photograph and other evidence to highlight why she should not testify in her case;

70. Notwithstanding the evidence, Ms. Arias told me that she would testify and that if the photograph was presented, she would testify that the photograph was of a non-existing half-sister;

71. Ms. Arias in fact knowingly perjured herself during her testimony by claiming that a compromising photograph of her used by the government as proof of her ongoing commission of fraud was of her "half sister";

72. Ms. Arias alleges that the stamps in the passport were valid and binding and that my failure to call an expert in immigration from the Dominican Republic or from a United States Immigration Specialist deprived her of a valid defense. The government presented such Immigration Specialist to rebut her testimony and to very clearly establish the lack of credibility of her defense regarding her claim of travel to the Dominican Republic;

73. My refusal to go along with Ms. Arias' efforts at artifice was a significant basis for her seeking my dismissal during her trial before Judge Wolf;

74. Ms. Arias asserted to Judge Wolf that one of the reasons that she was seeking my dismissal was that her boyfriend had not finished paying my fees. Judge Wolf directly inquired of me in open court and on the record whether the non-payment of my fees would have any impact on my continuing to represent Ms. Arias and I informed the Court that it would not;

75. At this point Judge Wolf gave Ms. Arias three choices: (1) she could continue with the trial with my representation; (2) she could retain new counsel who would immediately assume her defense and proceed with the trial; (3) she could represent herself and continue with the trial;

76. Ms. Arias chose to continue the trial representing herself. Judge Wolf ordered me to continue as stand-by counsel and to assist Ms. Arias in any way that she chose to do so. Ms. Arias essentially refused to speak to me;

77. I have no recollection of Ms. Arias ever providing me with the name of Onitxa Mercado as a potential exculpatory witness. Ms. Arias and I had discussed all potential witnesses and I submitted the names of potential witnesses to the Court. I do not recollect Ms. Mercado being on said list;

78. Ms. Arias claims in her petition that I failed to strategize with her. This is not accurate or true, as elaborated below;

79. It became apparent to me that Ms. Arias was not going to listen to my advice, based on the overwhelming evidence, to submit a Rule 11 Change of Plea and to seek to minimize what was inevitably going to be her eventual incarceration;

80. Because of her unbending views on her cases, I worked extra hard to ensure that I was not overlooking anything;

81. I spent inordinate hours reading and re-reading the evidence; reviewing and re-analyzing the indictments; researching cases and standards of proof; having Ms. Hedin re-examine these charges and cases;

82. I spent hundreds of hours on these two trials and I spent countless hours speaking with Ms. Arias at the jail; listening to her points of view; analyzing her opinions. My conscience is clear that I tried the very best that any attorney could have done on Ms. Arias' cases. Given the evidence against her; given her actions; there would not have been any different result from a jury. I'm certain of that;

83. With regards to Ms. Arias' claim of ineffectiveness for failure to object to judicial decisions, particularly the introduction of prior convictions and her claims of prejudice by failing to object to the Court's lack of special cautionary jury

instructions on the accuracy of eye witness identification, again I respectfully disagree with Ms. Arias' mischaracterizations;

84. Prior to trial all the evidence that the government was going to present was given to me, including her prior criminal records;

85. Ms. Arias and I reviewed all the evidence that the government had provided, including her criminal records;

86. Ms. Arias expressed her objections to the introduction of certain records and I filed a motion objecting to the portions of her criminal record to which she objected;

87. The Court reviewed and acted on the objections to the admissibility of certain of her criminal records;

88. No inadmissible criminal record was admitted against Ms. Arias. The criminal convictions that this Court admitted into evidence were fully admissible under the Federal Rules of Evidence;

89. With regards to the alleged special cautionary jury instruction on the accuracy of eye witness identification, there was no need to make this request. With regard to the identification testimony, a Lieutenant from the Lynn Police Department with many years of familiarity with Ms. Arias identified her in photographs;

90. Ms. Arias alleges ineffectiveness because of my failure to request a mistrial after it was alleged that a couple of jurors may have discussed the case during a time on non-deliberation;

91. This form of complaint occurs from time to time in trials and in my opinion at the time and still to this day, the procedure that the Court followed is the acceptable procedure;

92. The court made its inquiries regarding the nature of the alleged violation;

93. The court determined that the nature of the alleged violation was not significantly prejudicial to the defendant;

94. The court gave a very detailed and stern admonition to the deliberating jurors and no further allegations of violations were raised;

95. The nature of the alleged violation was not egregious and did not rise to the level that would have resulted in a mistrial;

96. The nature of the alleged violation did not deprive Ms. Arias of due process or of a fair trial. Had I, having handled numerous jury and non-jury criminal cases at the state and federal level, suspected that Ms. Arias' rights were not being adequately addressed by the Court, an objection would have been forthcoming;

97. Ms. Arias' claims of ineffectiveness based on *Brady* have been addressed above in my discussion regarding Ms. Mercado. I disagree with Ms. Arias' allegations and conclusions for the same reasons set forth if Paragraph 77 above; [See Documents #'s 150 and 151 in the Docket Sheet]

98. Ms. Arias' allegations of ineffectiveness based on my failure to object to PSR findings are not accurate;

99. First, Ms. Arias "fired" me as her counsel during her second trial. There is no dispute that the attorney-client relationship had been eroded and Ms. Arias chose to represent herself. Even as her stand-by counsel Ms. Arias essentially refused to discuss matters with me regarding her PSR;

100. The record also reflects that Ms. Arias also refused to discuss her PSR with the Probation Officer assigned to prepare same;

101. Prior to the commencement of trial before Judge Wolf, during a sidebar, I informed the Court that Ms. Arias was going to trial against my advice and I made further representations regarding my efforts on her behalf;

102.    At the close of the Government's case and before the defense's case. I had an
extensive conversation with Ms. Arias regarding the strength of the government's
case; I discussed with her the risk of her testifying and specifically advised her not
to testify and to cut her losses and reiterated that I did not wish to participate in
presenting any false evidence. It was at this point that Ms. Arias sought to have
me replaced;

103.    The Court denied Ms. Arias' request and permitted Ms. Arias to continue the
case pro-se and requested that I remain as stand-by counsel to enable Ms. Arias to
have someone available to answer/resolve/clarify any legal or procedural issues
that could come up during the remainder of the trial;

104.    During the remainder of her trial I made efforts to visit Ms. Arias at the Bristol
House of Corrections to see if she needed any assistance in the trial from me. I
did the same prior to her sentencing hearing. Each time that I went, Ms. Arias
would either come out briefly to tell me she did not want to speak with me or
would inform the staff that she did not want to see me;

105.    When the PSR was prepared I attempted to visit Ms. Arias to discuss same.
She refused to see me or discuss the case;

106.    After making at least three efforts, I stopped visiting her at the jail;

107.    I did not see anything in the PSR that was so out of place or inappropriate that
required an objection. I also was no longer Ms. Arias' chosen attorney and felt
that without her consent, which she refused to give, I could not respond to the
PSR on her behalf.

108.    Subsequent to her sentencing Ms. Arias filed a complaint with the
Massachusetts Board of Bar Overseers raising some of the same issues that she

has been raising regarding my representation of her. The complaint was answered by me and it was dismissed by the Board of Bar Overseers;

109.    The Massachusetts Board of Bar Overseers investigated the allegations that Ms. Arias raised in her complaints against me, including speaking with Attorney John P. Moss and Federal Defender Attorney Page Kelley.  In its response to her complaints the Board of Bar Overseers informed Ms. Arias of its investigation and told her that they did not find that my actions in representing her, did not violate any of the Rules of Professional Conduct. [See Exhibit #1, attached]

110.    I have also read a handwritten supplement to Ms. Arias's petition wherein she seems to be alleging that I was ineffective because I failed to object to the court's denial of petitioner's request for a psychiatric evaluation and for my failure to object to her being placed in a segregation unit;

111.    Ms. Arias may have narcissistic and self-centered issues that may benefit from psychiatric therapy. When appropriate, in other cases I have handled, when concerned about a client's mental state, I have made requests for psychiatric evaluations.  However, it was then and it is now my opinion that a psychiatric evaluation was not in order in these criminal cases;

112.    Ms. Arias knew and understood the nature of the charges against her;

113.    She was able to articulate and form an opinion, albeit an erroneous opinion, of the charges against her;

114.    She was able to discuss clearly the charges against her and was extremely familiar with the evidence and documents that the Government had provided through discovery;

115.    She did not disclose to me or to Attorney Moss a history of mental illness and had excellent recollection of all the facts surrounding her case;

116.    Had I considered at any point prior to or during either of her two trials, that

Ms. Arias was suffering from a psychiatric condition that would have prevented

her from understanding right and wrong during her offenses or fully

understanding the legal reality she was involved in, I would not have hesitated to

make such a request.  The concern never arose in this case;

117.    With regards to the isolation issue and the cruel and unusual punishment

claim, this was an administrative decision that was made as a result of Ms. Arias'

own actions during the time she was incarcerated;


Signed under the pains and penalties of perjury this 9th day of May, 2014



JOSE A. ESPINOSA